IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 21-00120-01-CR-W-HFS |
| ) | |
| JASON M. POTTER, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Pending is Defendant's Motion to Suppress filed on June 13, 2022. Doc. 74.[1] On July 15, 2022, the Government filed its opposition to Defendant's motion. Doc. 80. Defendant filed a pro se reply on August 4, 2022, which was "adopted" by defense counsel on August 8, 2022.[2] Docs. 83, 87. For the reasons set forth below, the undersigned recommends Defendant's Motion to Suppress be **DENIED**.

### I. BACKGROUND

On May 20, 2021, the grand jury returned an indictment charging Defendant Jason M. Potter with conspiracy to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846;

---

[1] Defendant previously sought and was granted leave to file his motion to suppress out of time. Docs. 72-73.

[2] On August 4, 2022, Defendant also filed a pro se "Opposition to Plaintiffs [sic] Response with Defendants [sic] Affidavit Attached Hereto" and another letter referencing an affidavit, both of which were adopted by his counsel. Docs. 84-85, 87. Additionally, Defendant filed a pro se "Affidavit in Support of Motion to Suppress with Suggestions." Doc. 95. "A defendant does not have a constitutional right 'to simultaneously proceed pro se *and* with the benefit of counsel.'" *Fiorito v. United States*, 821 F.3d 999, 1003 (8th Cir. 2016) (quoting *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994)). While this Court has discretion to permit "hybrid representation," no such request has been sought or granted in this matter. *United States v. Summage*, 575 F.3d 864, 876 (8th Cir. 2009). Nevertheless, the undersigned considered Defendant's pro se filings in the interests of justice and due to the unique circumstances of the instant matter, including counsel's "adoption" of the same. In doing so, the undersigned is not approving, or recommending the approval, of any form of hybrid representation where Defendant is allowed to proceed both pro se and through appointed counsel.

and possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Doc. 1. The charges stem from controlled substances seized by law enforcement after a traffic stop on July 15, 2020. *See id.* Defendant moves to suppress all evidence seized because law enforcement lacked probable cause to search his vehicle. *See* Doc. 74 at 7-14.

On August 17, 2022, the undersigned held an evidentiary hearing on Defendant's motion. Docs. 90, 92. Defendant was present and represented by counsel, Lisa Nouri. The Government was represented by Assistant United States Attorneys Maureen Brackett and Stephanie Bradshaw. At the hearing, Officers Andrew Jones, David Smith, and Casca Hunter testified. In addition, and without objection from Defendant, the Court admitted thirty exhibits. Doc. 93.

## II. FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1. On July 15, 2020, Officer David Smith and Sergeant Brad Anders with the Lee's Summit, Missouri Police Department ("LSPD") were conducting surveillance at America's Best Value Inn located at 1020 Southeast Blue Parkway, Lee's Summit, Missouri. Tr. at 6-8, 96-97, 99-100, 103.[3] The officers were surveilling the hotel due to complaints of drug activity and stolen vehicles being recovered there. Tr. at 9, 11-12, 73, 102-03, 128.

2. During surveillance, Officer Smith[4] and Sergeant Anders ran vehicle license plates and observed activities ongoing at the hotel. Tr. at 9-12, 103. At some point, the officers observed

---

[3] "Tr." refers to the Transcript of Hearing on Motions to Suppress Evidence. Doc. 92.

[4] For the past five years, Officer Smith has worked for the LSPD. Tr. at 95. Currently, he works as a police officer assigned to the Crime Reduction Team. *Id.* Prior to joining the LSPD, Officer Smith was a detention officer, a police officer and a detective in Sedalia, Missouri for fourteen years. Tr. at 95-96.

a black 2009 Nissan Maxima with the license plate number ZC3 A0L crookedly parked[5] between two spaces in the hotel's lot. Tr. at 103-04; Gov't Ex. 4.

3. Officer Smith provided the license plate number to Officers Andrew Jones and Casca Hunter to run through their computer system.[6] Tr. at 12, 105. Officer Jones[7] ran the Maxima's license plate number and advised the vehicle was registered to Defendant Jason Potter who had an outstanding arrest warrant for a parole violation.[8] Tr. at 12-13, 105-06. Officer Jones sent Defendant's driver's license photograph and identifiers, such as his height, weight, and eye color, to the surveilling officers. Tr. at 15-17, 107-08.

4. Officer Smith then observed Defendant exit the back side of the hotel with another individual, later identified as Codefendant Daniel Dryden, carrying two bags.[9] Tr. at 21, 108-109. Defendant placed the bags in the backseat of the passenger side of his vehicle and returned to the hotel. Tr. at 22, 109. Dryden drove Defendant's vehicle to the front of the hotel and cleaned trash out of the inside. Tr. at 109.

5. After a few minutes, Defendant exited the hotel carrying a brown bank money bag and sat in the front passenger's seat of the vehicle. Tr. at 110, 113. Officer Smith positively identified Defendant and observed his vehicle leave the hotel's parking lot and travel west. Tr. at 22, 113. Officers Jones and Hunter, who were parked in an unmarked police vehicle approximately

---

[5] Officer Smith found the manner in which the vehicle was parked – in two parking spots – was suspicious and suggested the person arrived quickly and was going to leave quickly. Tr. at 104-05.

[6] Officer Smith and Sergeant Anders were not in a police vehicle, and therefore, did not have access to a computer to run license plates. Tr. at 99, 105.

[7] Prior to his current employment with the St. Louis Police Department, Officer Jones was a LSPD police officer and a member of the Crime Reduction Team unit from January 2016 to March 2021. Tr. at 4-6.

[8] During previous surveillance, Officer Jones observed Defendant's vehicle at the hotel and ran its license plate. Tr. at 14, 71-72. Officer Jones was aware Defendant had an active parole violation warrant prior to his observations on July 15, 2020. Tr. at 13-14, 72.

[9] One bag was a black computer-type bag, and the other was a blue reusable Wal-Mart bag. Tr. at 109, 119; see Gov't Exs. 5-7.

two or three businesses away from the hotel, observed Defendant's vehicle drive past them on Southeast Blue Parkway.[10] Tr. at 10, 22-24; Gov't Ex. 1[11] at 1:49:13 – 1:49:15 p.m.; *see* Gov't Ex. 20.

6. Officer Hunter[12] initiated his vehicle's lights and sirens, pulled behind Defendant's vehicle, and conducted a traffic stop. Tr. at 134; Gov't Ex. 1 at 1:49:13 – 1:49:45 p.m.; Gov't Ex. 4.[13] He approached the vehicle on the driver's side, and Officer Jones approached on the passenger's side. Tr. at 27-28; Gov't Ex. 1 at 1:49:53 – 1:49:59 p.m.

7. The officers asked both vehicle occupants for their identification. Tr. at 30-32; Gov't Ex. 1 at 1:50:07 – 1:50:10 p.m. Defendant shuffled through multiple cards and eventually provided his driver's license to Officer Jones. Tr. at 29-31; Gov't Ex. 1 at 1:50:10 – 1:50:43 p.m.; Gov't Ex. 3. Officer Jones asked Defendant to step out of the vehicle and inquired if he possessed any weapons. Tr. at 31-32; Gov't Ex. 1 at 1:50:50 – 1:51:05 p.m. Defendant did not respond to the officer's inquiry about weapons, which Officer Jones found concerning. Tr. at 31-32.

8. Defendant then asked if he could call "his people." Tr. at 31-32; Gov't Ex. 1 at 1:51:01 – 1:51:08 p.m. Officer Jones said, "You're not gonna be makin' phone calls," and removed a cell phone and wallet from Defendant's hands. Tr. at 32, 72, 84; Gov't Ex. 1 at 1:51:03 – 1:09 p.m. According to Officer Jones, he removed the items so they could not be used against the officers and so he could gain control of Defendant's hands for detention. Tr. at 32, 72, 84.

---

[10] According to the officers, Southwest Blue Parkway is an outer road running parallel to U.S. 50 Highway and is "very traveled." Tr. at 23.

[11] Government's Exhibit 1 is the video recorded by Officer Jones's dashcam. Tr. at 24-25. Officer Jones testified the video is a true and accurate representation of the traffic stop and interaction with Defendant on July 15, 2020. Tr. at 25.

[12] For the past five years, Officer Hunter has worked as an LSPD patrol officer and is currently assigned to the Crime Reduction Team. Tr. at 132. Prior to joining law enforcement, Officer Hunter served five years in the United States Marine Corps, and four years in overseas contracting. Tr. at 133.

[13] Officer Jones identified the voice in Government Exhibit 1 as his own. Tr. at 28-29. According to the officers, Officer Hunter's microphone was not synched to the dashcam footage. Tr. at 28-29, 134-35.

Defendant's cell phone and wallet were placed on top of his vehicle, and Defendant was detained. Tr. at 32-33, 72; Gov't Ex. 1 at 1:51:06 – 1:51:32 p.m.  Officer Hunter escorted Defendant to the front of his patrol vehicle, and Officer Jones contacted Dryden. Tr. at 33-34; Gov't Ex. 1 at 1:51:33 – 1:51:57 p.m.  Officer Jones asked Dryden if his driver's license was valid, and he advised it was not. Tr. at 34; Gov't Ex. 1 at 1:51:59 – 1:52:16 p.m.  According to Officer Jones, law enforcement cannot allow a non-licensed driver to continue operating a motor vehicle. Tr. at 34.

9. Although Defendant's arrest warrant was showing as "active" in the computer database, Officer Jones contacted dispatch to confirm the warrant remained active. Tr. at 35; Gov't Ex. 1 at 1:52:39 – 1:53:22 p.m.  To make this confirmation, dispatchers contact the warrant's originating agency, inquire if it is still active, and determine if the agency will extradite and pick up the individual. Tr. at 35.  Simultaneously, Officer Hunter conducted a pat down of Defendant's person for any weapons or contraband. Gov't Ex. 1 at 1:52:24 – 1:53:22 p.m.

10. Defendant was placed in the back of the police vehicle, and Officer Jones again contacted Dryden. Gov't Ex. 1 at 1:54:12 – 1:55:59 p.m.  After a brief conversation, Officer Jones returned to the police vehicle, ran Dryden's information, and confirmed his driver's license was suspended. Tr. at 36-38, 85; Gov't Ex. 1 at 1:56:19 – 1:58:50 p.m.

11. Because Dryden could not legally drive the vehicle due to a suspended license, Officer Jones asked Defendant if anyone was available who could remove the vehicle from the scene. Tr. at 34, 38-39; Gov't Ex. 1 at 1:58:50 – 1:59:17 p.m.  Defendant provided two names of authorized drivers: (1) Glen Bernstein, and (2) Erin, the hotel's night manager.[14] Tr. at 39; Gov't

---

[14] Officer Jones did not know "Erin" personally and did not know what she looked like. Tr. at 74-75, 85-86.  Based on prior surveillance, Officer Jones knew a red Explorer was registered to someone named "Erin Melton," but he was unaware if Erin Melton was the same "Erin" who was identified by Defendant. Tr. at 74-75.

Ex. 1 at 1:59:18 – 2:00:13 p.m. Defendant provided a phone number for Mr. Bernstein. Tr. at 47-48; Gov't Ex. 1 at 2:00:13 – 2:00:18 p.m.

12. At approximately 2:01 p.m., dispatch confirmed Defendant's arrest warrant remained active and the originating agency would extradite. Tr. at 40, 72-73, 115; Gov't Ex. 1 at 2:01:15 – 2:01:32 p.m. Officer Jones contacted Dryden, who was still in the driver's seat of Defendant's vehicle, and released him with a warning. Tr. at 46; Gov't Ex. 1 at 2:01:36 – 2:01:57 p.m. Dryden indicated he would walk away from the scene and exited the vehicle. Tr. at 42-43; Gov't Ex. 1 at 2:02:43 – 2:03:44 p.m. As Defendant had authorized Erin as a potential driver, Officer Jones asked Dryden to return to the hotel and contact her which he agreed to do. Tr. at 42, 47-48.

13. Defendant, still seated in the backseat of the police vehicle, asked to speak with Dryden. Gov't Ex. 1 at 2:04:37 – 2:04:50 p.m. While the two men conversed, Officer Jones made two attempts to call Glen Bernstein.[15] Tr. at 44-45, 48, 80, 87-88; Gov't Ex. 1 at 2:05:00 – 2:06:13 p.m.; Gov't Ex. 8. The first call was made at 2:05 p.m., and the second call occurred at 2:06 p.m.[16] Tr. at 45-46, 48, 87-88; Gov't Ex. 8. During each call attempt, the phone rang approximately six to eight times before voicemail answered. Tr. at 90-91; *see also* Gov't Ex. 1 at 2:05:00 – 2:05:35, 2:05:38 – 2:06:13 p.m. Mr. Bernstein did not answer either call, and Officer Jones did not leave a voicemail. Tr. at 45-46, 80, 91; Gov't Ex. 1 at 2:05:00 – 2:06:13 p.m.; Gov't Ex. 8.

14. After a brief conversation between Defendant and Dryden, Officer Hunter informed Officer Jones that Dryden would walk back to the hotel and ask Erin, the night manager, if she would drive Defendant's vehicle away. Tr. at 46-47; Gov't Ex. 1 at 2:06:56 – 2:07:14 p.m. Dryden

---

[15] According to Officer Jones, his phone number was not blocked when he contacted Mr. Bernstein. Tr. at 79-80, 88-89; *see also* Gov't Ex. 8.

[16] The duration clock on the call history began when the voicemail picked up the call. Tr. at 90-92.

asked if he could have Defendant's keys, but Officer Jones declined the request because he was not sure if Dryden would be returning to the scene with Erin. Tr. at 48, 76; Gov't Ex. 1 at 2:07:13 – 2:07:22 p.m. According to Officer Jones, the hotel was approximately a quarter mile away and roughly a five-minute walk. Tr. at 69-70, 114.

15. Officer Jones inventoried the contents of Defendant's wallet which contained $3,500 in cash. Tr. at 48-49, 81; Gov't Ex. 1 at 2:06:46 – 2:09:45 p.m. Shortly thereafter, Defendant was informed he was under arrest, and read his *Miranda* rights which he stated he understood. Tr. at 49; Gov't Ex. 1 at 2:12:50 – 2:13:15 p.m. Defendant exited the patrol vehicle at the officer's request, and was searched incident to arrest. Tr. at 49-50; Gov't Ex. 1 at 2:15:42 – 2:18:24 p.m. During the search of his person, Defendant repeatedly hunched over allegedly due to a cyst on his testicles. Tr. at 50; Gov't Ex. 1 at 2:17:10 – 2:17:30, 2:18:27 – 2:18:46 p.m.

16. Defendant asked the officer to make another phone call, and in response, Officer Jones showed Defendant his two previous attempts to contact Mr. Bernstein. Tr. at 51-52; Gov't Ex. 1 at 2:20:47 – 2:21:18 p.m.; Gov't Ex. 8. At 2:23 p.m., Officer Jones called Mr. Bernstein for a third time and, again, received no answer. Tr. at 51, 66, 82-83, 88; Gov't Ex. 9.

17. Defendant was transported from the scene in a separate patrol vehicle at approximately 2:24 p.m. Tr. at 52; Gov't Ex. 1 at 2:24:53 – 2:24:58 p.m. Because no authorized individual was available to drive Defendant's vehicle, Officers Jones and Hunter discussed whether to tow the vehicle. Tr. at 53-54, 135-36, 140; Gov't Ex. 1 at 2:25:14 – 2:28:45 p.m. The officers contacted their supervisor, Sergeant Anders, who confirmed a tow should be ordered. Tr. at 53-54, 78, 135-36, 140; Gov't Ex. 1 at 2:27:14 – 2:28:01 p.m. Rather than immediately ordering a tow, Officer Jones first filled out a portion of the tow sheet to provide additional time for Erin

from the hotel or someone else to arrive to remove Defendant's vehicle.[17]  Tr. at 54-55, 67, 136; Gov't Ex. 1 at 2:25:33 – 2:25:35, 2:28:48 – 2:34:40 p.m.; Gov't Ex. 30.  Officer Smith and Sergeant Anders, who were still near the hotel, did not observe anyone in the hotel's parking lot or along the roadway heading toward the other officers.  Tr. at 120-21.

18.     Officer Jones testified the decision to tow Defendant's vehicle and conduct an inventory search was pursuant to a LSPD tow policy.  Tr. at 57-58.  Pursuant to the policy, an officer may order a vehicle be towed from public property when, *inter alia*, the vehicle's operator "is taken into custody," and relevant here, "[t]he person is unable to arrange for the vehicle/property's proper and timely removal," or "[n]o passengers are present who can legally remove the vehicle/property with the driver's consent."[18]  Tr. at 57, 67-68, 141-42; Gov't Ex. 2 at 3.  Officers Jones and Hunter ordered a tow of Defendant's vehicle shortly after 2:30 p.m.  Tr. at 57-58, 67-68, 82, 90, 117; Gov't Ex. 1 at 2:34:22 – 2:34:44 p.m.; Gov't Ex. 30.  According to Officer Jones, LSPD does not allow arrested individuals to contact private companies to tow their vehicles.  Tr. at 58-59, 78, 81-82, 90.

19.     There is also an inventory search procedure within the LSPD's tow policy which requires law enforcement to conduct an inventory search of a vehicle being towed.  Tr. at 76; Gov't Ex. 2 at 2.  At approximately 2:34 p.m., Officer Hunter searched Defendant's vehicle beginning at the front driver's side door.  Tr. at 59; Gov't Ex. 1 at 2:34:50 – 2:36:55 p.m.  And approximately eight minutes later, Officer Hunter began searching the rear passenger's side.  Tr. at 60; Gov't Ex. 1 at 2:41:37 p.m.

---

[17] The officers never saw Dryden again.  Tr. at 55.  Neither Mr. Bernstein nor Erin arrived to retrieve Defendant's vehicle.  Tr. at 55; Gov't Ex. 1 at 2:24:53 – 3:08:09 p.m.

[18] The LSPD's policy does not set forth procedures to be used when the vehicle's owner is the passenger who is taken into custody and the vehicle's operator is legally prohibited from operating the vehicle and voluntarily leaves the scene.  Tr. at 77; *See* Gov't Ex. 2.

20. During the search, officers identified the two bags Defendant placed in the backseat. Tr. at 62-64, 117-19; Gov't Ex. 1 at 2:43:34 – 2:43:45 p.m.; Gov't Exs. 5-7, 30. A subsequent search of those bags revealed large bags of methamphetamine, small jewelry bags used to package methamphetamine, a small scoop to distribute methamphetamine, digital scales, prescription pills, a cell phone, cash, and marijuana. Tr. at 64, 119, 121-26; Gov't Exs. 10-16, 30.

21. At 2:45 p.m., Officer Jones contacted the jail at dispatch's request. Tr. at 64-65; Gov't Ex. 1 at 2:45:28 – 2:46:10 p.m. He was advised a satchel containing suspected methamphetamine was recovered from Defendant's waist. Tr. at 65, 119-20; Gov't Ex. 1 at 2:45:37 – 2:46:10 p.m. LSPD's tow policy also permits a tow of a vehicle when "an officer has probable cause to believe the vehicle/property is evidence in a crime." Tr. at 86-87; Gov't Ex. 2 at 3. Regardless of his decision to tow the vehicle due to Defendant's arrest and the unavailability of an authorized driver, Officer Jones testified he would have still ordered a tow once he learned about drugs being found on Defendant's person because the vehicle was potentially evidence in a crime. Tr. at 87, 90; *see* Gov't Ex. 2 at 3.

22. At approximately 2:58 p.m., nearly twenty-five minutes after the inventory search began and after suspected controlled substances were recovered from Defendant's person at the police station, an unidentified individual arrived at the scene and asked to remove the vehicle. Tr. at 83-84, 89-90, 137-40. The individual did not identify himself as Mr. Bernstein, and officers did not ask for his name. Tr. at 89-90, 138-40. Officer Hunter had previously observed this individual park his motorcycle at a QuikTrip convenience store up the road and watch the officers for several minutes. Tr. at 138-39. Shortly after 3:00 p.m., Defendant's vehicle was towed. Gov't Ex. 1 at 3:03:29 – 3:08:07 p.m.; *See* Gov't Ex. 30.

9

### III. DISCUSSION

Defendant moves to suppress all evidence seized from his vehicle on July 15, 2020. *See* Doc. 74. He argues law enforcement violated his constitutional rights when they (1) waited for him to leave private property to arrest him, and (2) searched his vehicle without probable cause. *See id*. The Government does not address the timing of Defendant's arrest. *See* Doc. 80. Relating to Defendant's second argument, the Government contends the vehicle search was valid pursuant the inventory exception to the warrant requirement. *Id*. at 6-9. Alternatively, the Government claims the evidence discovered in his vehicle would have been inevitably discovered. *Id*. at 9-10.

**A.     Validity of Arrest**

The motion to suppress filed by defense counsel concedes Defendant's arrest was lawful. *See* 74 at 9 ("Defendant Potter had a valid no bond arrest warrant entitling law enforcement to legally arrest him."). Defendant's pro se filing, however, appears to allege officers "were not armed with legal process, or an active arrest warrant" at the beginning of their encounter. Doc. 83 at 4. The evidence presented at the hearing established Defendant's arrest warrant was valid and active, and Defendant failed to present any evidence to the contrary. Accordingly, the undersigned recommends that any argument concerning the validity of the arrest be denied.

**B.     Discretion for Traffic Stop**

Defendant contends law enforcement improperly waited until he left private property to initiate a traffic stop. *See* Doc. 74 at 5, 9-10, 13. "A traffic stop constitutes a seizure under the Fourth Amendment and must be supported by either reasonable suspicion or probable cause." *United States v. Foster*, 15 F.4th 874, 877 (8th Cir. 2021). A traffic stop is supported by reasonable suspicion when, for example, "there are reasonable grounds to believe that person is wanted for past criminal conduct." *United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981). If an occupant of a vehicle has an outstanding arrest warrant, the police may stop the vehicle if they reasonably

suspect the wanted person is inside. *See United States v. Kent*, 531 F.3d 642, 650 (8th Cir. 2008); *see also United States v. Cardenas-Celestino*, 510 F.3d 830, 833 (8th Cir. 2008) (observing that "[w]hen probable cause to arrest exists, police are authorized to stop a vehicle containing the subject.").

Here, surveilling officers observed a Nissan Maxima, registered to Defendant, at America's Best Value Inn. Based on their previous surveillance when the vehicle was at the same location, the officers were aware Defendant had an active arrest warrant. The officers again confirmed the existence of the outstanding arrest warrant for Defendant during their investigation on July 15, 2020. The officers obtained a driver's license photograph of Defendant and other identifiers, such as his height, weight, and eye color. Surveilling officers positively identified Defendant and observed him exit the hotel and place two bags in the backseat of his vehicle. The driver of the vehicle (later identified as Dryden) moved the vehicle to the front of the hotel while Defendant went back inside. Defendant then exited the hotel a second time, and entered his vehicle on the passenger's side.

Defendant's vehicle left the hotel's parking lot and headed west on Southwest Blue Parkway. Officers Jones and Hunter, who were parked approximately a block away, observed the vehicle drive by with Defendant in the passenger seat. Officers Jones and Hunter initiated a traffic stop and executed the pending arrest warrant. Defendant's argument concerning the timing and location of the stop of the vehicle is unavailing. There is no constitutional right to be arrested. *Hoffa v. United States*, 385 U.S. 293, 310 (1966). Further, once law enforcement possesses probable cause to arrest an individual, they are not required to do so at a particular time or a particular location. *See United States v. Johnigan*, 90 F.3d 1332, 1337 (8th Cir. 1996); *see also Hoffa*, 385 U.S. at 310 (recognizing the police are not required to arrest a suspect at the "precise

moment" at which they have probable cause). Accordingly, the undersigned recommends a finding that the officers' decision to stop Defendant's vehicle was proper and reasonable.

**C.     Inventory Search of Defendant's Vehicle**

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend. IV. To protect citizens from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a judicial search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2002). The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

One recognized exception to the Fourth Amendment warrant requirement is the inventory search exception. *See United States v. Williams*, 39 F.4th 1034, 1043 (8th Cir. 2022); *United States v. Nevatt*, 960 F.3d 1015, 1020 (8th Cir. 2020). "It is well-settled law that a police officer, after lawfully taking custody of an automobile, may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody." *United States v. Williams*, 777 F.3d 1013, 1015 (8th Cir. 2015) (citation and internal quotations omitted); *see also United States v. Green*, 929 F.3d 989, 992 (8th Cir. 2019) ("An inventory search is reasonable if it is conducted according to standardized police procedures, because doing so vitiates concerns of an investigatory motive or excessive discretion.") (citation and internal quotations omitted). "The purpose of an inventory search is to protect the owner's property while it remains in police custody, as well as protect police against claims or disputes over lost or stolen property and from potential

dangers." *Nevatt*, 960 F.3d at 1020 (citation omitted). Law enforcement officers may not, however, use an inventory search as a "ruse for general rummaging in order to discover incriminating evidence." *Id*. "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005).

The Eighth Circuit has observed the inventory search exception often involves distinct police actions, including the decision to impound or tow a vehicle and the decision to search the contents of the vehicle. *See United States v. Arrocha*, 713 F.3d 1159, 1162 (8th Cir. 2013). Regarding impoundment, the police may take protective custody of a vehicle when they have arrested its occupants, even if it is lawfully parked and poses no public safety hazard. *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004). "[P]olice may exercise discretion to impound a vehicle, 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Id*. (quoting *Colorado v. Bertine*, 479 U.S. 367, 375, (1987)).

Defendant contends the officers were not justified in their initial decision to impound and tow the vehicle pursuant to the LSPD tow policy. The officers testified their tow decision was pursuant to Section III(B)(1)(f) of the tow policy, which authorizes officers to tow a vehicle on public property when (1) "the **operator** of the vehicle/property is taken into custody," and (2) "[t]he person is unable to arrange for the vehicle/property's proper and timely removal," or "[n]o passengers are present who can legally remove the vehicle/property with the driver's consent." Gov't Ex. 2 at 3 (emphasis added).

Although the officers relied on Section III(B)(1)(f) of the LSPD tow policy, the evidence adduced at the hearing suggests this section does not precisely fit the unique facts of this case. Here, the "operator" of the car (Dryden) was not taken into custody but was allowed to leave the

13

Case 4:21-cr-00120-RK   Document 99   Filed 10/14/22   Page 13 of 18

scene as he was legally prohibited from driving the car with a suspended license. Further, it was the owner and passenger (Defendant) who was taken into custody and there were no other individuals present who could drive the vehicle.[19]

The Eighth Circuit has observed that tow policies are unique in that they "cannot feasibly give 'clear cut guidance in every potential impoundment situation.'" *Green*, 929 F.3d at 992 (quoting *Petty*, 367 F.3d at 1012). Such is the case here. The Eighth Circuit has also recognized that "inventory searches need not be conducted in a totally mechanical, all or nothing fashion." *Nevatt*, 960 F.3d at 1020 (citation omitted). "Even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search." *United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013) (quoting *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003)). The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (citation omitted). Consequently, an inventory search is considered reasonable even when police do not adhere to standardized procedures if the search is not a pretext for an investigatory search. *Nevatt*, 960 F.3d at 1020; *United States v. Morris*, 915 F.3d 552, 557 (8th Cir. 2019) (quoting *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011)). To show pretext, there must be something else "to suggest the police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *Nevatt*, 960 F.3d at 1020 (citation omitted). Thus, when officers are not acting in strict accordance with a standard

---

[19] As written, it makes little sense to restrict Section III(B)(1)(f) to only an "operator" and not include the owner of the vehicle, especially in light of the unique aspects of this case where the operator cannot lawfully drive the car and is allowed to leave the scene while the owner/passenger is arrested and taken into custody and no one else is present to drive the car. The Court also questions whether the use of the term "operator" as opposed to "owner/operator" is an error, as the term "owner/operator" is used in numerous other provisions of the tow policy. *See* Gov't Ex. 2. In any event, a court cannot rewrite a standardized tow policy to account for every possible scenario.

procedure or policy, the Court must determine if law enforcement's conduct was nonetheless reasonable and not a pretext for an investigatory search. *See Morris*, 915 F.3d at 557.

Here, Officers Jones and Hunter knew Defendant had an outstanding arrest warrant and was a passenger in a vehicle they observed. The officers stopped Defendant's vehicle at 1:49 p.m., and shortly thereafter, Defendant was detained. Officers Jones and Hunter then determined Dryden, who was operating Defendant's vehicle, did not have a valid driver's license. At 1:59 p.m., Officer Jones asked Defendant who to contact to remove the vehicle. Defendant identified Glen Bernstein and Erin, the hotel's night manager.

Officer Jones unsuccessfully attempted to contact Mr. Bernstein by telephone on three separate occasions. Additionally, Officer Jones and Defendant asked Dryden to return to the hotel to ask Erin to remove the vehicle. After waiting approximately thirty minutes from the beginning of the traffic stop, Officers Jones and Hunter contacted their supervisor, Sergeant Anders, who confirmed a tow should be ordered. Rather than immediately calling a tow truck, Officer Jones began filling out the tow sheet to provide additional time for someone to arrive to remove Defendant's vehicle. Mr. Bernstein, Erin, nor Dryden ever arrived back at the scene, and a tow was ordered shortly after 2:30 p.m.

At 2:34 p.m., forty-five minutes after the traffic stop was initiated, Officer Hunter began an inventory search. Tellingly, Officer Hunter's search began in the front seat of the driver's side. Approximately eight minutes later, he searched the rear passenger's side and discovered Defendant's bags. Although the undersigned is mindful of Defendant's arguments that someone could have arrived, or, alternatively, officers could have sought a search warrant, the officers' actions do not establish any pretextual basis for the tow decision and the inventory search, nor has it been established that officers towed Defendant's vehicle on suspicion of criminal activity at that time. Instead, officers made efforts to accommodate Defendant's request for alternative drivers

and waited approximately forty-five minutes for an authorized driver to arrive to remove Defendant's vehicle from the scene. No such person ever arrived prior to the start of the inventory search. After consulting with a supervisor, the officers decided to impound Defendant's vehicle pursuant to the LSPD tow policy, even though said policy did not squarely address the unique factual circumstances of this case.

On this record, there is no evidence the police impounded Defendant's vehicle or conducted an inventory search[20] as a pretext to conduct an investigatory search. Further, the officers' decision to tow Defendant's vehicle was not done in bad faith or for the sole purpose of conducting a criminal investigation. Based on the totality of the circumstances, the officers' actions were reasonable. Accordingly, the undersigned recommends a finding that the evidence seized from Defendant's vehicle should not be suppressed pursuant to the inventory search exception.

**D.     Inevitable Discovery**

Alternatively, the Government maintains Defendant's motion should be denied because the contraband in Defendant's vehicle would have been inevitably discovered. Doc. 80 at 9-10. The Eighth Circuit utilizes two approaches to evaluate the inevitable discovery doctrine. *See United States v. Baez*, 983 F.3d 1029, 1038 (8th Cir. 2020). Under the first approach, evidence is admissible if the Government establishes the "evidence would have been acquired lawfully but for the constitutional violation." *Id*. (citations omitted). Under the second approach, the inevitable discovery doctrine applies if the Government demonstrates by a preponderance of the evidence that (1) "there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct," and (2) law enforcement was "actively

---

[20] The LSPD tow policy also authorizes inventory searches. Tr. at 76; Gov't Ex. 2 at 2. Defendant's briefing does not challenge the manner or scope of the inventory search in this matter. *See* Docs. 74, 83-85, 87.

pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Connor*, 127 F.3d 663, 667 (8th Cir. 1997) (citation omitted); *see also Baez*, 983 F.3d at 1039.

In *Baez,* the Eighth Circuit recognized it has been inconsistent as to which standard should apply when evaluating the inevitable discovery doctrine. *Baez*, 983 F.3d at 1039. Nonetheless, the Eighth Circuit utilized both standards when finding the evidence should not be suppressed. *Id.* at 1036-40. Regardless of which approach is utilized, the undersigned recommends a finding that the contraband from Defendant's vehicle need not be suppressed pursuant to the inevitable discovery doctrine.

At 2:24 p.m., Defendant was transported to the police station, and ten minutes later, Officer Hunter began inventorying the vehicle. At approximately 2:45 p.m., Officer Jones was informed a satchel containing suspected methamphetamine was recovered from Defendant's waist during the booking process at the police station. This was also consistent with Officer Jones's initial search of Defendant at the scene of the traffic stop when he kept bending over to avoid a search of that area of his body due to purported medical reasons. Officer Jones testified that regardless of the decision to tow the vehicle due to Defendant's arrest, and the unavailability of an alternate driver, he would have ordered a tow of Defendant's vehicle after the discovery of drugs on the Defendant's person because the vehicle was potentially evidence in a crime. The unidentified individual arrived on the scene fifteen minutes after officers were informed about the methamphetamine on Defendant's person. As such, his subsequent arrival has no material bearing on inevitable discovery because the tow would have presumably been ordered prior to his arrival.

Consequently, even if officers did not order a tow until they were informed of the methamphetamine found on Defendant's person at the police station, a subsequent tow and inventory search would have been conducted pursuant to the tow policy and would have inevitably

17

Case 4:21-cr-00120-RK   Document 99   Filed 10/14/22   Page 17 of 18

led to the discovery of the contraband in Defendant's backseat. The Government has met its burden, under either approach, of demonstrating the evidence would have been inevitably discovered. Accordingly, the undersigned recommends a finding that the evidence seized need not be suppressed pursuant to the inevitable discovery doctrine.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress (Doc. 74). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying any additional or alternative relief sought in Defendant's pro se filings (Docs. 83-85, 95).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: October 14, 2022  */s/ W. Brian Gaddy*
W. BRIAN GADDY
UNITED STATES MAGISTRATE JUDGE